IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| MICHAEL ABRAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 12-3012 |
| | ) | |
| SPRINGFIELD URBAN LEAGUE, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

RICHARD MILLS, U.S. District Judge:

Pending before the Court is the Defendant's Motion for Summary Judgment.

Plaintiff Michael Abrams has filed a Complaint which alleges claims pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (ADEA), arising from his employment with Defendant Springfield Urban League.  Abrams also asserts a supplemental state law retaliatory discharge claim for exercising his rights under the worker's compensation statute.  The Defendant claims that Plaintiff's former position was eliminated and his duties were consolidated into a new position.

## I. FACTUAL BACKGROUND

<u>A. Introduction</u>

Defendant Springfield Urban League ("the Defendant" or "Springfield Urban League") is a federally funded not-for-profit human services organization that employs approximately 245 individuals and operates the Head Start Program,[1] which includes the Head Start, Early Head Start and Wee Grow programs.  Plaintiff Michael Abrams ("the Plaintiff" or "Abrams") was employed by the Defendant as the Maintenance Coordinator from August of 2005 until August 27, 2010.

Nina Harris has been employed by the Springfield Urban League for over 20 years.  For the past nine years, Harris has served as its President/Chief Executive Officer (CEO).  Beverly Hicks-Gibson has been employed by the Springfield Urban League for thirteen years.  Hicks-Gibson first served as the Fiscal Officer for the Head Start Program.  She then became the Springfield Urban League's Chief Financial Officer

---

[1]Head Start is a program of the United States Department of Health and Human Services that provides comprehensive education, health, nutrition, and parent involvement services to low-income children and their families.

2

("CFO") in 2003 and now serves in dual roles as the CFO and Senior Vice President.

B. Springfield Urban League in 2009-2010

The Defendant alleges that, during the 2009-2010 academic year, the national and local economy was in a state of flux.  The Plaintiff claims the general state of the national economy is not relevant to what happened in Springfield, Illinois.  During this period the National Urban League, of which the Defendant is an affiliate, took measures to support and fortify affiliates because their doors were closing across the country.  Abrams further disputes this allegation because Harris's statements cited in support of the assertion relate to the National Urban League's closing of affiliates in Ohio.

The Defendant also alleges that, at the start of the 2009-2010 school year, serious budgetary concerns caused it to closely review its overall operational costs, given that the State of Illinois had already raised concerns as to its commitment to provide continuous funding of Springfield Urban League programs.  Harris testified that the Illinois Department of Public

3

Health, a long-time source of funding for Springfield Urban League's service programs, advised the Defendant that the State would no longer compensate providers based upon a verbal commitment. Accordingly, the Defendant had to scramble to find resources to compensate employees and was forced to lay off employees. Abrams disputes that the problems were serious or based on the State of Illinois' funding. Moreover, he claims that the consolidation of the transportation and maintenance coordinator positions were specifically under the Head Start Program which was federally funded, not state funded.

The Defendant further alleges that Nina Harris recalled a conversation related to the Springfield Urban League's Head Start Program with a federal representative who cautioned that it maintain its operations within contractual confines. The Plaintiff disputes this and other allegations related to the 2009-2010 academic year on the basis that the statements constitute inadmissible hearsay.[2]

---

[2] As the Defendant notes, however, the Court can consider these statements offered for purposes other than the truth of the matter asserted. For example, a statement offered to demonstrate the effect on the listener in order to explain the listener's actions does not constitute inadmissible hearsay.

4

As part of her job responsibilities, Human Resources Officer Karen Norris received an annual loss run from the Defendant's worker's compensation carrier, Midwest Insurance.  The Defendant experienced a substantial increase in costs related to required workers' compensation premiums with an expectation of continued increases.  In 2009, the Defendant's workers' compensation payment obligations increased by $111,572.74 over the prior year and this unanticipated increase caused heightened budgetary concerns.  Additionally, there was an increase in costs related to its health and dental insurance premium obligations.

The Defendant further experienced concerns about potential rising future utility costs based on ongoing discussions about construction of a new local power plant.  The Plaintiff disputes the allegation, claiming that Springfield Urban League Head Start's utility costs actually decreased from $175,789 in 2009 to $172,424 in 2010.

As a result of these ongoing budgetary concerns, at the end of the

---

*See Jewett v. Anders*, 521 F.3d 818, 825-26 n.5 (7th Cir. 2008).  Here, the statements are offered to explain why decision-makers at the Springfield Urban League believed cutting costs was an important concern.  The Court will consider statements offered for such a purpose.

2009-2010 school year, the Defendant took the unprecedented step of terminating all employees.  Thereafter, Springfield Urban League conducted an internal audit of the Head Start Program that included: reviewing employee personnel files, assessing employee's performance evaluations, assessing individual employee's compliance with the federal educational mandate, and analyzing the Head Start Program's finances.  Abrams disputes these allegations as misleading.  He notes that the funding for the Head Start and Early Head Start Program did not reduce from 2009 to 2010, but actually increased by $149,209.  Harris described the financial situation facing the organization "as even worse than we've seen it in years past."

The Defendant alleges that not only did funding for the 2009-2010 school year not include any increase in operational costs, but it was anticipated that funding would remain stagnant for the 2010-2011 school year.  The Plaintiff disputes the allegation, claiming that the funding for the Head Start Program increased from 2009 to 2010 and its increase of operational costs did not exceed the increase in funding.  Moreover, Head

Start/Early Head Start funding increased by another $94,304.00 from 2010 to 2011.

The Springfield Urban League did receive Federal stimulus money in the form of a cost-of-living adjustment ("COLA") for fiscal year 2011 in the amount of $96,909.  However, the COLA was directly tied to employee salaries; therefore, Hicks-Gibson could not re-allocate any of these dedicated purpose funds to cover other Head Start expenditures.  After Springfield Urban League completed its proposed budget for the 2010-2011 school year, Harris directed Hicks-Gibson to prepare and present recommendations on ways the Defendant could save money and reduce its operational budget.  Hicks-Gibson evaluated a proposed consolidation of the Springfield Urban League Transportation and Maintenance Departments as a possible means to address its budgetary constraints.

C. Consolidation of Transportation and Maintenance Departments

Beverly Hicks-Gibson determined that a consolidation of the Transportation and Maintenance Departments was a viable and necessary option due to overall rising operational costs.  Hicks-Gibson relied upon

Head Start program class size and staffing patterns to further assess possible cost reductions. Specifically, the Illinois Department of Children and Family Services and the federal Head Start Program regulations each required a certain number of staff to work in the classrooms and to serve as bus drivers and bus monitors, which necessitated the Springfield Urban League to look at administrative and managerial positions for possible cost reductions. Under the Head Start Program's mandatory staffing requirements, neither the Maintenance Coordinator nor the Transportation Coordinator positions were required. Therefore, Hicks-Gibson proposed that these two separate positions be eliminated.

Based on the alleged need to reduce operational costs, Hicks-Gibson recommended that Springfield Urban League eliminate the position of Maintenance Coordinator then held by Abrams and the position of Transportation Coordinator held by Tami McKittrick and that Robert Garee, a Springfield Urban League employee with greater employment seniority, be appointed to a newly created and consolidated Transportation/Maintenance Coordinator position. The Plaintiff disputes

the allegation on the basis that Hicks-Gibson was not clear on what criteria was actually used when recommending Garee.

Robert Garee was hired by the Springfield Urban League on December 15, 2003. The Plaintiff disputes that allegation and claims Garee was hired on April 13, 2004. The Plaintiff was hired on August 29, 2005. Tami McKittrick was hired on September 5, 2006.

Beverly Hicks-Gibson's recommended that Garee be appointed to the newly consolidated Transportation/Maintenance Coordinator position with the specific understanding that Garee's current position with the Springfield Urban League was also scheduled to be eliminated due to a lack of continued funding. At the time of Hicks-Gibson's consolidation recommendation, Garee served in a managerial capacity and his responsibilities included overseeing the Put Illinois to Work Program ("PITW") and helping to ensure coordination between PITW employers and the placement of participant PITW employees. Garee previously served as Abrams's supervisor and, after Garee's supervisory duties with respect to Abrams ended when Garee obtained a different position with the

Springfield Urban League, the Plaintiff continued to seek out Garee for counsel and guidance as it pertained to issues involving the Maintenance Department.

The Defendant alleges Nina Harris took the recommendation made by Hicks-Gibson under consideration after it was established that Garee, who was then about 30 years old, was the most senior employee as compared with Abrams and McKittrick.  Thereafter, Harris independently assessed Garee's qualifications for the consolidated Transportation/Maintenance Coordinator position.  Harris made the final decision on all Springfield Urban League terminations and hires.  She selected Garee as the Transportation/Maintenance Coordinator because he was the most senior employee.  Additionally, he possessed the educational background and experience Harris desired for this new, consolidated position.  Abrams disputes these allegations, claiming that Hicks-Gibson and Harris provided inconsistent testimony in discussing Garee's recommendation.

Harris then instructed Howard Peters, a member of the Springfield

Urban League's senior leadership team, to notify Abrams of the decision to eliminate his employment position.  Harris told Peters that an analysis of the Defendant's operational costs revealed the need for Springfield Urban League to "tighten their belts" and mentioned that the organization faced increased costs related to worker's compensation, health and dental. Human Resources Officer Karen Norris was present when Peters informed the Plaintiff of his termination.

The Defendant alleges Peters advised the Plaintiff that the Maintenance Coordinator position, among others in the Springfield Urban League's Head Start Program, were being eliminated due to increased costs related to worker's compensation and health care insurance coverage which necessitated the restructuring.  Abrams disputes these assertions as misleading, claiming that he was informed by Peters that his termination was due to budget constraints, department consolidation and worker's compensation.[3]  The Plaintiff, who was described as an exemplary employee, was not terminated by the Defendant due to any disciplinary

---

[3]This "dispute" may simply be a slightly different interpretation of the same conversation.

11

reasons.

The Defendant contends that the consolidation of the separate Springfield Urban League Transportation and Maintenance Coordinator positions reduced its Head Start Program's annual costs by approximately $22,000 a year.  Abrams disputes the allegation as misleading, suggesting that costs were not reduced because Robert Garee received a significantly higher salary in his new position than Abrams did in 2010.

D. Additional Reduction in Force

Beverly Hicks-Gibson ultimately determined that a total of ten positions, including the Maintenance Coordinator position and the separate position of Transportation Coordinator, needed to be either consolidated or eliminated.  An additional eight employee positions that were eliminated by Springfield Urban League were administrative or managerial positions within the Head Start Program.  Specifically, the Advocate positions were reduced from eight to three, and the five Site-Substitute positions were converted into two Education Assistant positions.  Additionally, the Defendant had recently reduced a twelve-month Head Start Program site

12

to a nine-month site.

E. Abrams's claim of age discrimination

Michael Abrams was born on February 18, 1942.  Thus, when the Plaintiff was hired by the Springfield Urban League in August of 2005, he was 63 years old.  When Abrams's position was terminated in August of 2010, he was 68 years old.

The Plaintiff testified his sole basis for believing the Defendant discriminated against him is that someone younger took his position.  The Plaintiff claims that Carl Acres, who Abrams presumed to be in his 30s, was the individual who replaced him as the Maintenance Coordinator.  Acres, who was 53 years old in 2010, was a PITW participant.  Thereafter, he remained at Springfield Urban League in a temporary capacity as a Transportation Assistant until August of 2011.

The Plaintiff admitted that no one at Springfield Urban League made any statement referencing his age or his ability to perform his job aside from describing his performance as exemplary.  Moreover, Abrams testified that no one affiliated with the Defendant stated that the organization

needed someone younger in his position.

The Defendant alleges that Plaintiff admits no Springfield Urban League officer said anything that would suggest age was a factor in his employment position being eliminated. The Plaintiff disputes this statement as misleading and claims it distorts his testimony.

The Defendant asserts that, based on the undisputed material facts, the Plaintiff is unable to produce either direct or indirect evidence of age discrimination, or that his termination was causally connected to the exercise of his right to workers' compensation. It claims that the decisions were all made for legitimate business reasons. The Plaintiff contends that there are genuine factual disputes which preclude the entry of summary judgment.

## II. DISCUSSION

### A. Legal standard

Summary judgment is appropriate if the motion is properly supported and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). The

14

Court construes all inferences in favor of the Plaintiff.  *See Siliven v. Indiana Dept. of Child Services*, 635 F.3d 921, 925 (7th Cir. 2011).  To create a genuine factual dispute, however, any such inference must be based on something more than "speculation or conjecture."  *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted). Because summary judgment "is the put up or shut up moment in a lawsuit," a "hunch" about the opposing party's motives is not enough to withstand a properly supported motion.  *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).  Ultimately, there must be enough evidence in favor of the non-movant to permit a jury to return a verdict in its favor.  *See id*.

### B. Age Discrimination

In attempting to withstand summary judgment, a plaintiff in a discrimination case may proceed under the direct method or indirect method.  *See Fleishman v. Continental Casualty Co.*, 698 F.3d 598, 603 (7th Cir. 2012).  Abrams seeks to prove he was discriminated against on the basis of age via the indirect method.

(1)

15

In a mini-reduction in force, an employee's duties are generally absorbed by another employee or multiple employees. *See Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 492 (7th Cir. 2007). When an employee's claims are analyzed under the indirect method, courts employ a burden-shifting method whereby Abrams can establish a prima facie case of discrimination by showing that (1) he is over the age of 40; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) his job duties were absorbed by employees who were not members of his protected class. *See id*. The Defendant acknowledges the Plaintiff can assert a prima facie case of discrimination in the context of a mini-reduction in force.

Once the plaintiff meets his burden of production, a presumption of discrimination arises and the defendant must articulate a legitimate, non-discriminatory reason for the challenged employment action. *See id*. The burden then shifts back to the plaintiff, who has an opportunity to create a genuine issue of material fact by showing that the alleged reasons are pretextual. *See id*.

16

The elimination of certain positions during difficult financial times is a legitimate means for an entity to achieve necessary cost savings during difficult economic times, which is sufficient to satisfy an employer's burden of production. *See Janiuk v. TCG/Trump Co.*, 157 F.3d 504, 510 (7th Cir. 1998).

The Defendant alleges it had a reasonable and sound belief that the financial climate warranted legitimate action. The Springfield Urban League enacted a number of cost saving measures due to the uncertainty of federal and state funding of their programs, the state of the national and local economy and mounting operational costs. The Defendant implemented a cost reduction plan to address and manage the Head Start programs. In a single year, in 2009, the Defendant's cost for worker's compensation claims increased by $111,572.74, with an expectation of continued increases. There was also an increase in costs related to its health and dental insurance premium obligations. While Abrams states that Springfield Urban League Head Start's utility costs actually decreased from $175,789 in 2009 to $172,424 in 2010, Nina Harris testified that

17

Defendant was concerned about potential rising future utility costs based on ongoing discussions about the construction of a new power plant. Additionally, the Springfield Urban League was warned by a federal funding source to maintain operations within contractual confines. Although the Springfield Urban League received federal stimulus funds, that source could not be used to offset operational costs because the funds were specifically targeted for employee salary increases.

Nina Harris testified that because of the fiscal climate in 2009-2010, there was a significant degree of uncertainty regarding finances. The National Urban League was taking measures to support and fortify affiliates in Ohio in order to prevent them from closing. Harris described the situation as "even worse than we've seen in years past." As a result, the Springfield Urban League was forced to eliminate ten positions, one of which was the Plaintiff's Maintenance Coordinator position.

Based on the foregoing, the Court concludes that Defendant has presented a legitimate, non-discriminatory reason for the employment action. The financial climate was such that leaders at the Springfield Urban

League determined that certain measures needed to be taken in order to avert fiscal disaster going forward. Such a decision is a "legitimate business and economic reason[] for the adverse employment action," which satisfies an employer's burden of production. *See Janiuk*, 157 F.3d at 511.

(2)

To meet his burden of showing pretext, the Plaintiff must present sufficient evidence for a rational jury to determine that the Defendant's reasons for the employment decision had no basis in fact, did not actually motivate its decision, or were insufficient to motivate the decision. *See Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 473 (7th Cir. 2002). "An employee discharged in a [reduction in force] is not required to produce evidence tending to prove that the employer's explanation was a lie in the sense of it being a complete fabrication; instead, he must establish that age tipped the balance in favor of discharge." *Wilson v. AM General Corp.*, 167 F.3d 1114, 1120 (7th Cir. 1999) (internal quotation marks and citation omitted). The critical inquiry is whether the same decision would have been made if the employee was younger than 40 and the circumstances

19

were otherwise similar.  *See id*.

The Plaintiff claims that, for a number of reasons, factual disputes preclude the entry of summary judgment in the Defendant's favor.  The Plaintiff contends first that the Defendant's proffered reason that he was terminated due to the dire financial state of the Springfield Urban League's Head Start and Early Head Start Programs cannot be believed.  Abrams claims that federal funding of the Defendant's program was increasing at a greater rate than the operational costs were increasing.  He alleges that the only expenditure that was unanticipated was the increase in worker's compensation insurance.

However, there is no dispute that Harris and Hicks-Gibson had legitimate concerns about the future of the Springfield Urban League. These concerns was based on a number of factors, including the performance of the national and local economy, discussions pertaining to reduced funding at the state and local level and potential rising utility costs. The fact that all Springfield Urban League employees were terminated at the end of the 2009-2010 school year so that an internal audit of the Head

Start Program could be conducted suggests that the poor financial climate was not a pretext for age discrimination.

The Plaintiff contends that, even assuming the Defendant's reduction in force was warranted by the existing financial climate, the Springfield Urban League's decision to terminate the Plaintiff and appoint a 32-year old as the Transportation/Maintenance Coordinator raises the inference that Abrams's age of 68 was the actual reason for his termination. The Court disagrees. The Plaintiff has failed to cast any doubt on the Defendant's explanation that, in considering the three candidates for the newly consolidated position, it chose the candidate with the most seniority who was also well-qualified. Abrams's speculation to the contrary is not enough to create a factual issue as to whether this was the real reason.

There is nothing inherently discriminatory about an employer's use of seniority in determining which employee to retain in a reduction in force. *See Smith v. General Scanning, Inc.*, 876 F.2d 1315, 1322 (7th Cir. 1989). Undoubtedly in many cases, the use of a seniority system will result in the older candidate obtaining the job. Except for the Plaintiff's speculation,

21

there is no suggestion that Springfield Urban League discriminatorily applied the seniority system in this case.

The Plaintiff further asserts the Springfield Urban League's officers have been inconsistent as to the criteria used to select Robert Garee over Abrams.  Neither Nina Harris nor Beverly Hicks-Gibson had extensive knowledge regarding the Plaintiff's job performance, academic credentials or experience at the time they selected Garee for the position.  The Defendant claims that seniority was the first criteria used to evaluate whether an individual was an appropriate candidate.  The fact that Harris and Hicks-Gibson testified about traits other than seniority in discussing Garee's qualifications, such as education and work experience, does not mean Garee was selected based on a reason other than seniority.  It was reasonable for the decision-makers to consider whether Garee was otherwise qualified for the position.  After Harris determined Garee was qualified for the Transportation/Maintenance Coordinator position, he was chosen based on his seniority.  Abrams's qualifications are not relevant to that inquiry.  It is not for the Court to determine whether this was a wise

22

decision; rather, the issue is whether the proffered reason was a lie.  *See O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011).  The decision-makers' alleged lack of knowledge of the Plaintiff's background does not create a factual dispute regarding whether the Springfield Urban League has been truthful regarding the employment decision.

Abrams further claims that although the Springfield Urban League now says Garee's date of hire was December 15, 2003, the relevant documents reflect that he was hired on April 13, 2004.  The actual date of hire is irrelevant in determining which employee had greater seniority.  Because Abrams was hired in August of 2005, Garee had seniority for purposes of the employment decision based on either date.

Finally, the Plaintiff asserts that Defendant has failed to provide any reason other than human error to account for the inconsistent job descriptions/qualifications of the new Transportation/Maintenance Coordinator position.  Abrams claims these inconsistencies create a genuine issue of material fact on the issue of pretext.

Presumably, the Plaintiff is referring to the academic requirements for

the position.  The Court concludes this information is irrelevant.  It is true that prior to the consolidation of the two positions, Abrams's Maintenance Coordinator position did not require a bachelor's degree.  Moreover, the job description of the Transportation/Maintenance Coordinator position as of October 2010, which was two months after Garee was selected, did not require a bachelor's degree.  The position's job description was later amended at an unknown date to require a bachelor's degree, preferably in Management, Business, or Business Administration.  Although Abrams does not discuss the relevance of these job descriptions, the Court concludes the information is immaterial because the Plaintiff was no longer employed at the Springfield Urban League when the job description for the Transportation/Maintenance Coordinator position was amended.  Moreover, the Plaintiff points to no reason why the educational qualifications of a new position cannot be revised after the position is created.

(3)

Although Abrams questions who made the decision to eliminate his

24

position and hire Garee for the newly-created one, both Nina Harris and Beverly Hicks-Gibson testified that Harris made the final decision on all terminations and hires.  Without pointing to any evidence in the record, the Plaintiff claims that Hicks-Gibson "made the unilateral decision to terminate Plaintiff."   Based on the record evidence, therefore, it is undisputed that Harris was the decision-maker.

This has some significance because it was Harris who hired Abrams only five years earlier.  "Common sense tells us that it's unlikely for a person to suddenly develop a strong bias against older folks." *Martino v. MCI Communications Services, Inc.*, 574 F.3d 447, 454-55 (7th Cir. 2009). In *Martino*, the Seventh Circuit cautioned against placing too much emphasis on the "same-actor" inference, *see id.*, and the Court does not do so here.  The fact that Harris hired Abrams when he was 63 years old is just one more reason why he is unable to show that the employment decision was a pretext for age discrimination.

## III. CONCLUSION

For the reasons stated herein, the Defendant has presented

25

legitimate, non-discriminatory reasons why the Plaintiff was terminated. The Plaintiff has not established that those reasons are a pretext for age discrimination.  Accordingly, the Defendant is entitled to summary judgment on the Plaintiff's ADEA claims.

Because no federal claims remain, the Court declines to exercise jurisdiction over the Plaintiff's supplemental state law claims.  *See* 28 U.S.C. § 1367(c)(3); *see also Sharp Electronics Corp. v. Metropolitan Life Ins. Co.*, 578 F.3d 505, 514 (7th Cir. 2009) ("Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.") (internal quotation marks omitted).

Ergo, the Motion of Defendant Springfield Urban League for Summary Judgment [d/e 31] is ALLOWED as to Count I.

Judgment shall be entered in favor of the Defendant and against the Plaintiff on Count I.

The Court declines to exercise supplemental jurisdiction over the Plaintiff's state law claim.  Therefore, Count II is DISMISSED WITHOUT

PREJUDICE.

The final pretrial conference set for September 17, 2013 at 1:30 p.m., and the jury trial set for October 1, 2013 at 10:00 a.m., are hereby VACATED.

This case is terminated.

ENTER: August 28, 2013

FOR THE COURT:

*s/Richard Mills*

Richard Mills
United States District Judge